Good morning. My name is Steve Sherrick. I'm representing the appellant Phillip Narum. I'd like to reserve three minutes for rebuttal. All right. If you can watch the clock, I'll try to help you as well. Thanks, Judge. The arguments I wanted to focus on for today, and I'll try to answer your questions, is arguments A, E, and G in appellant's brief, those relate to the other bad, or the other act evidence that was submitted in the case, and which is our position, overwhelmed the evidence that related to the wire frauds that were charged in the indictment. And they severely impacted the whole case, from the finding of guilt to the calculation of the sentence to the restitution that was ordered. The other act evidence that was received in evidence had to do with payments that were made for employment compensation. And all of those payments, I summarized them at page 11 of the brief, amounted to $735,000 of employment payments to Mr. Narum during the time that he worked for Young & Sons. None of those payments were unlawful or illegal. They appeared to be perhaps, they looked bad, but were not unlawful. Well, and speaking of looking bad, let me give you one example. What gave your client authorization to transfer funds out of Young & Associates to purchase a dragster? And that's, you've made the distinction that I was going to, am raising in the argument. That transfer from Young & Sons' bank account is, I believe it's count two of the indictment. That's separate and apart from all of the act evidence that had to do with his employment compensation. The government charged that count and said although he was an authorized signatory on the bank account, he was not authorized to make that particular wire transfer. So that actually fits within, but all of the information that was introduced at trial that had to do with, he made too much money, was basically the government's claim, was separate and apart from the counts charged in the indictment. Now, I do want to make a distinction with respect to counts one, two, and six. Those were actually wire transfers from Mr. Narum's bank account. Not the company's bank account, but Mr. Narum's bank account. That's where I thought you were going to start, actually. So when you say A, E, G, and F, my brain spins. Okay. Okay. So let's talk about counts one, two, and six. That's where he gets, Young and Company gets money. He takes certain money and he puts it in his private account, right? And you would agree that potentially the transfer from Young and Company to his private account, that could be the basis of a wire fraud if, in fact, there's fraud in doing that, right? I'm not sure I am. From Young and Company to his private account. Yeah. So first of all, the money that went into Mr. Narum's account was all checks he received from Young and Company. Right. Well, of course. Checks that he wrote and deposited to himself. But then my question is, see, you're fighting too hard. Okay. I'll relax. Money from Young and Company to his private account, that is the source of some of the counts of the indictment, right? Correct. And there's an allegation referenced by Judge Nelson and also in the briefs that that included this so-called compensation that wasn't really appropriate, right? Yes. Okay. So then he now has a private account and he has money in it. So the question is, if he goes out and he buys groceries or he goes to the QFC, where in this case buys dragster paraphernalia and cars, et cetera, does it matter what he does once the money is in his private account for purposes of the wire fraud? That's correct. Does it matter? It doesn't matter. And why not? It doesn't matter because if there was a conversion, and we're not conceding that it was a real legal conversion. No, I understand. But once he deposits that money, and it's alleged that those funds were fraudulently obtained, the deposit is the conversion. And once the deposit's made, it doesn't matter how he spends the money. You don't get like to double count and get another wire fraud because you then took the money from your private bank account and wired it to X, right? No. And really what's happening on those counts is, again, assuming that any of the deposits for compensation were not authorized or were fraudulent, what the government's trying to do is bootstrap it into a wire fraud case when at best it's a state fraud case. But we would argue that it's not even a state fraud case because those employment compensation payments were all earned by Mr. Naram. Bottom line, though, I gather your point is that counts 1, 2, and 6, there's insufficient evidence to sustain a wire fraud conviction because he, by that point, had taken the money, whatever, placed it in his personal account. What he did once it was in the personal account did not constitute wire fraud. Is that your point? That's correct.  That's correct. So it wouldn't have mattered what he used the money for. It doesn't matter. Dragster just has a kind of a, maybe a bad sound to it because it makes the jury think he's frivolous with the money, perhaps. Right. It enhances the prejudicial effect that that evidence would put in front of the jury. Now, with respect to, and here's how it gets, here's how it really gets confused. So you think that's your best shot, is that indicating what your client used the money for is so prejudicial that it overrides the conviction? No, that's not my argument at all. My main argument. My main argument is that the government being permitted to introduce the fact that Mr. in employment compensation and then makes a claim that that employment compensation is fraudulent without proof of that fact is what prejudiced the case. So, and the evidence. Isn't, I mean, you're talking about embezzlement and wire fraud here. Isn't it just standard procedure to consider what is, in quotes, legitimate contractual payment for services rendered versus what is something else? For example, I know you have a point here that things that were signed by Young or other people or that occurred prior to the time that the criminal activity began should not be counted. I gather the government doesn't agree with that. But that's all part of the whole consideration. It's perfectly normal to consider what he was making, isn't it? Well, it'd be normal to consider it if it was related to wire transactions, which it's not. But you can't tell what's related to the wire transactions unless you know what part is legitimate. Even during the period where your client was accused of having extorted, but removed money from his employer, he was getting paid. He was being compensated for work he was doing. So they had to know what portion was, in quotes, legitimate, didn't they? Well, here's how you make that distinction. And it goes back to the use of two things. One, the company bank account, and two, the credit cards. And the company bank account, what we're talking about is checks that Mr. Narum wrote or the single wire transaction that's charged in count three from the Young & Sons bank account. Now, I would agree that the government could have said, look, here's the deal. He was an employee for the company. He was earning compensation from the company. But he also got signatory authority on the bank account. And as a signer on the account, he wrote checks for personal purchases. And he made this wire transaction that was also unauthorized. And say, the checks that were written on the Young & Sons account and the wire transfer that was made were unauthorized. And that's their theory of prosecution. And that would fit. And that would fit under the cases in terms of what are intrinsic transactions. All of the other things, all of the money he received as employment compensation has nothing to do with his use of the Young & Sons bank account. The second theory as related to the credit cards. Speak into the microphone. I'm sorry. The second theory as related to the credit cards is that the government claimed that he was not authorized to use the credit card. And again, this fits exactly like the intrinsic cases cited by the government where what the government had done was charged, well had proven a series of transactions but only charged selected transactions. That's the way the credit card could have been introduced. They could have said, okay, we're charging five counts of the use of the credit card and we're going to pick these five. But we're also going to prove up the other uses of the credit card to show that there's one scheme, use of a credit card without authorization. Or in this case, it wasn't even use of the credit card without authorization because the evidence was undisputed that the use for personal purchases was authorized by Mr. Young. Mr. Narum tracked those purchases. He just didn't repay it and wasn't requested to repay it. So that's how the case should have been. Well, so what you're saying is he had authority to use the credit card, but he didn't repay it. And because they didn't ask him, it was okay for him to basically pocket that money or in effect the credit. Right. Why isn't that fraud? Because there wasn't any question that he tracked every single one of his personal purchases and identified which were those and acknowledged that he owed it. He did it contemporaneously when he made the purchases. He admitted to the ---- Just because he kept a ledger, he somehow exonerated? I'm sorry, Judge. No, it's not just because he kept a ledger. It's also because Young & Sons had this voucher system where Bryant Young reviewed the vouchers, which would be paid the credit card charges. Bryant Young told the employees that they could use the credit cards for personal purchases. And then what were they supposed to do? Well, that's the ---- They were supposed to pay it back, right? Actually, no. Really? No. That's not what the testimony is. Yeah, what the testimony was, and this came from Steve Clark, the CPA, and also was in the government's evidence, that there were five employees who had credit cards. And none of them paid back personal charges. And all of the credit card charges were deducted on the company's tax returns. So nobody paid it back. So that ---- Do you want to reserve your remaining time? But I think there may be one more question. The standard we're looking at here, though, is the jury heard this testimony. Aren't we really considering whether, in light of the evidence that was presented, whether a reasonable juror would find that your client had, in fact, committed fraud? Whatever happened with the other employees? And here's the problem. The jury wasn't able to do that because if you look at the overall trial, the overall trial wasn't about the 14 charges in the indictment. The overall trial was about Mr. Narum got $735,000 as employment compensation, and he shouldn't have been paid that much. So that was the focus. That was the thrust of the case. And that overwhelmed the other ---- That's your take on it. But that's not what the government said, was it? They didn't say he shouldn't have earned this much money? Yes, they did, throughout the trial, from opening statement to closing argument. You're not suggesting there's been some kind of constructive amendment from the indictment? That wasn't alleged, right? No. What happened was Judge Burry, at the government's request, permitted them to introduce all of that as other act evidence as part of the scheme, and it wasn't part of the scheme. But I would like to go to Judge Smith's question. Couldn't the jury infer that your client did not intend to pay for his personal use of the company card? Because he was embezzling funds through other means, and he never did intend it. I don't care about the other employees and they let them get away with it, but couldn't ---- wouldn't that be a proper inference that the jury could draw? Yes, but it wouldn't have to do with employment compensation, which is the $735,000. It could have something to do with his personal use of the company card. It could. But, see, when the focus gets directed over here, we don't get to focus the defense on the fact that there was preapproval, there was review of the charges, there was Bryant Young claiming these charges on his income. I wasn't ---- I was allowed to argue it, but the focus of the case ended up being on the other act, employment compensation, rather than the specific credit card charges. But if we ---- if that's determined to be inextricably intertwined, then it simply becomes part of the backdrop and the background of the case as a whole, and it's really up to you to shift the focus, right? I mean, if it's legally admissible. Right. And our position is it's not legally admissible. Okay. Thank you. Thanks, Judge. Good morning. May it please the Court. Jane Westby on behalf of the U.S. Could you speak up into the microphone? Oh, yes, of course, Your Honor. Thank you. Is that better? Much better. Jane Westby on behalf of the United States. The government asks that this Court affirm the convictions in this matter. There was overwhelming evidence of guilt in this case beyond just the payments. The jury could reasonably find that the defendant, the evidence showed, was employed in 2004 and could reasonably find that he started stealing right away. Counsel, let me ask you a question. Yes, sir. I'm just picking this because it's in front of me right now. I find no evidence that ties the judge's loss and restitution calculation to the amounts that Mr. Narum received from Young & Sons prior to the date that he received signature authority. I don't find any evidence that those were procured by fraud. Can you tell me any evidence that does show that they were procured by fraud? Certainly. There were ‑‑ I'll have to break the time period down into three pieces. Originally, there was a contract in place, and, Judge, if you look, I believe that's at Exhibit 627, SER 627. I'm sorry, 627? 627. I believe that's a ‑‑ Exhibit or ER? SER, Your Honor. SER, okay. And, yes, Exhibit 627, that will talk about the unauthorized payments over the entire period of time. At first, and first of all, 2004 is not at issue. So beginning for about a year, beginning in November, or I guess it was 2005, the defendant started stealing money. And the evidence of that ‑‑ That's after he got the signature authority, right? Or was that before? Well, before and after. Before he got signature authority, he was under a contract and also an oral agreement. And Mr. Young testified that under the contract, he was allowed $6,000 a month and nothing more. And that's what's shown on SER 627. And then there was a period of time where there was an oral agreement where he was to be paid $6,750 a month and nothing more, and Mr. Young testified to that. And then that, I believe, will bring you up to the time where he obtained signatory authority in October of 2006. So you're saying that the evidence shows that even though he didn't have signature authority, that by virtue of the oral agreement that he had, that he abused that and he began to steal even before the signature authority. Is that right? That's correct. That's absolutely correct. And then, because Mr. Young was clear that he was only owed certain amounts per month and then the government presented the evidence of all the money that he took, and the defense presented evidence that, well, Mr. Young had signed checks himself for the defendant. But the evidence was that the defendant would fill out the checks, present it to Mr. Young, and he would sign multiple checks after the defendant gave him some story about a hardship or something, and he was just trying to be a nice guy. So at trial — That was a proof, though, wasn't it? I mean, whether you agree that Mr. Young was wise or not, the reality is Mr. Norum, I think that's how you pronounce it, went to him and said, look, I've got a really tough deal here. I'd like you to advance some money. If Mr. Young approves it, that's not illegal, is it? No, it's not illegal. But Mr. Young also testified that by signing those checks, it wasn't an intention that he get more money than what he was owed, in other words, under that first contract or the oral agreement after that first contract. In other words, the government's position that that was merely an advance on what was to be paid, right? That's correct. That's correct, and nothing more. And then, of course, after signatory authority was achieved in 2006, that was about the same time that this second written contract was put into place, and there was the same evidence there that he was not owed $500,000 as a minimum, as the defense said. He was owed $100,000 a year. So overall, the evidence at trial was that although the defendant was owed $328,000 under the two contracts and the written oral agreement, he helped himself to more than a million dollars in just three and a half years before he was terminated, and that's all laid out in SCR 627. And then also, defense counsel was stating that, well, gosh, the evidence was or the defendant was prejudiced by this overwhelming information of all these checks to the defendant. Well, the government respectfully disagrees. There was just such overwhelming evidence of the fraud, and, of course, we know that the defendant slowly took control of the counting system. The bookkeeper left. He changed CPAs after he got signatory authority. In 2007 alone, he paid himself almost a half a million dollars. When the nephew wanted to come in and sell the company and he was going to bring in some accountants, the defendant quashed that, and, of course, the payments to conceal. The defendant admits that approximately $61,000 he put back into the business under the ruse that it was from him when it wasn't. Let me ask you this, counsel. What's the government's position about counts 1, 2, and 6? You heard the dialogue that we had with your opposing counsel. It's his position that once the money was taken from the company and placed into Mr. Naroom's personal account, that whatever he used it for at that point was not wire fraud because that had been completed at that point. Do you agree with that? No, I don't, and the case law doesn't agree with that either. The defendant at trial tried to argue or tried to state and get a jury instruction of the fact that once money is irrevocably deposited into a defendant's account, that that's the end of a fraud scheme. But that's clearly not what the case law says. What about Redcorn, the Redcorn case? What's your position on that? The Redcorn case is distinguishable from this case, especially under this recent court's opinion in Tankey. And in Tankey, what the court said was that if there is an ongoing conspiracy and there is a transaction that occurs during this conspiracy that's designed to conceal or avoid responsibility, that that's within the wire fraud statute. Is there a conspiracy charge? I'm sorry. I meant scheme. I apologize. Usually that does work better in a conspiracy charge. But here, it seems to me that this isn't a case of cover-up. I mean, once it's in the bank account, he's kind of hosed on the first wire fraud. I mean, he's basically completed at least an alleged illegal transaction, according to the government. It's in his bank account, and under the banking laws, he has full authority to do whatever he wants with that money in the account, right? That's true. Why do you allege that it's some kind of an additional cover-up, the fact that he actually spends some of the money, but not all the money? Well, and what the evidence shows is that the defendant had moved. First of all, he'd taken money out of the victim's account via check. And then shortly thereafter, sometimes within a day, he deposited into his own account so that he could do these wire frauds out. Right. And it's the government's position that he did that to avoid detection. But I don't understand why the use of money out of his private account, then, is alleged to avoid detection. Well, because it's not coming out of the victim's account. The wires for the dragsters weren't directly out of the victim's account. He already got the money out of the victim's account. That's correct. See, that's my point, is that he already he didn't need to cover that. If he was going to cover something up, he should have covered that up.  And then it gets plopped into his personal bank account, right? Correct. I had the same problem here. Wouldn't the proper charge here have been under 18 U.S.C. 2314, which would be interstate transfer of stolen property? Judge, I can't answer that directly. That might have been an alternative charge. But the government's position is, based on this Court's law under Tankey, that the movement of the funds, well, first of all, he got the checks under his name from out of the victim's account. And so that could conceivably have looked or been passed over, but certainly not if he had been wiring out money for a dragster, although that's what he did in Count 3, and I'll talk about that in a second. But so he tried to make an innocuous check to himself under Counts 1, 2, and 6, took out money, and then wired it from his own account. And to answer your question, Your Honor, Let's go back to Counts 1, 2, and 6. Is that wire transfer from his personal account to purchase the dragsters and other things? I'm sorry? Is that the underlying transaction? That's right. From his account wired out to purchase the dragsters. Getting into his account, you've charged him for that, right? We have not charged him from taking the checks out of the operating account or putting them into his own account. The only charge for 1, 2, and 6 is for the wires out to purchase for the dragsters. So there is no double counting, as defense counsel alleged. I guess in terms of his view, whether that all folds into his, quote, compensation. You have charged him on that. We have charged him. Well, he was charged. The charges, the majority of the charges were under the credit card charges. Right. And then the overall scheme included the payments to himself by check because really the scheme was stealing the money. And there were just different methods that he stole the money. Sometimes he'd- You're not claiming there was an attempt to conceal payments that were made from his, I'll call that his personal account, once he'd gotten money from Young and Sons and put it in that account, right? No, but the purpose of putting it into his personal account was to conceal those wires to the dragsters. Right. But once he paid that out, I mean, it would be incredibly dumb. He buys a dragster and shows up at work with it. I mean, or at least people knew he had these cars. It would be a very bad way of concealing it. Yes, people knew that he had the cars, but the government's position is that he wired the money out of his account so it wouldn't show up on the company books as being wired out. And if you look at Tanky as opposed to Redcorn, in Redcorn the defendant really did have all the money. The scheme was done by the time those accounting payments or the payments went from- To be sure I understand this, because you may get yourself in trouble on this one, is it your point that we have to look at this wire fraud as being a totality that is coming from the company account through the personal account and then using it? If one leg of that is missing, you don't have a conviction? Is that what you're saying? No, Your Honor. I wasn't trying to imply that. I thought your position was, and I thought the case law supported, that when the money came from the company and went to his personal account, the wire fraud was complete. Yes. Right? Do you agree with that? No. Not in this instance. Under the reading of Tanky, the fraud was ongoing because the defendant would be expected to receive more funds under the fraud. So you've got an ongoing fraud, and the government's position is that the movement from his personal account to buy the dragster, that movement was for the purpose of concealing it. If he goes and buys groceries, is it the same thing? That would be the same thing in this case. In other words, any time he spent a penny out of his personal account, you're saying that's a scheme in furtherance of the fraud, even though he left some of the money in his personal account. Because under Tanky, the scheme was ongoing. And instead of – and see, he's using his personal account as a way station, just as if he had used the operating account, and it's used to disguise the movement of the money. In other words, instead of – and I understand what you're saying, but instead of – I actually have to say, this is where I'm – because you're saying he's using his personal account to disguise the money. So he puts money into his personal account. So what does it matter if he spends it or doesn't spend it? Well, in Accounts 2 and 6, there's also discussion in the case law about the temporal proximity. And I also believe in the Redcorn case, it was quite a long time before the money was transferred from the personal account to the investment account. Well, that's what – that's what I'm troubled with, and I think my colleague is as well, because on 1, 2, and 6, you're saying this is just ongoing, but every time he moves money out of the personal account, it's part of the scheme. On the other hand, if he had, as my colleague suggested, if he had taken the money from the company, left it in the personal account, and done nothing further with it during the time period in question, is it the government's position that no wire fraud would have occurred? Yes, I think that would be a different situation, because here he's putting it, let's take Accounts – Yes, but there would have been wire fraud or no, there wouldn't have been. If the time period had been longer, I don't believe that there would be wire fraud. But in this case, because in Accounts 2 and 6, in this case, it was a matter of a day or even two days before he moved the money out. We're talking about 1, 2, and 6. Clearly, the purpose of moving the money – Okay, you did say 2. Right. And the purpose of moving that money into the account, I mean, clearly, was just to disguise where the money was coming from. And so moving the money out of the account was really in furtherance of the fraud, in this case, because of the temporal proximity. And that's how it's different than Redcorn. And I believe it also dovetails in with Tankey, because Tankey talks about that such a case like this is like an easy case. These are one of the easy cases to determine. But you're claiming that it is necessary for him to move it out of the personal account in order to have wire fraud. In this case, it's not necessary to have wire fraud. But in this case, it's appropriate to have wire fraud because of the temporal proximity with which he moved the money in and out of. Let me ask it a different way. He got a check, or he had a check, and then he puts it in. Yes. So if instead of a check, he had wired it from the company to his personal account as compensation or whatever, but he shouldn't have had the money, would that be wire fraud? I don't think under that factual scenario it would be. Because why? Because he's trying to break that link in the chain between his personal account and getting the victim's money. So he takes it out in check, and later he deposits it. I'm not hearing myself. Oh, I'm sorry. And I probably didn't say it very clearly. He doesn't use a check. He wires it from Young and Company to his personal account. Is that wire fraud if he wasn't supposed to have the money in the first place? The wire from, yes. Company to his personal account. Yes. Would be wire fraud. And the reason you couldn't charge wire fraud here on that is because he actually used a check. That's correct. He deposits the check into his account. And I suppose you could have charged. Why isn't that the fraud, is the fraudulent use of an instrument to put money into his account? That's the crime, isn't it? I think it may have been charged that way if you could get the nexus between, you know, where the bank check clears the check. And I don't know why it wasn't charged that way. So that seems to me it's like Judge Nelson was saying, it's like the wrong charge because money is in his account now and what he does with it is not really fulfillment. I mean, does he spend all the money? Does he take out all the money that he checked in? I believe that it's very close in amount. I mean, you can see that the operating account or his account is really just a way station for this Young & Sons money that just immediately in Counts 2 and 6 goes out to get his dragsters. And I see that I'm out of time, but I wanted to make one more brief point. You know, there is no direct count or, excuse me, direct attack on Count 3 in the indictment. And that actually was a wire directly from the victim's operating account to buy his dragster. So if the court finds, and the only argument that I can see in the brief that may go towards that count would be that all of the other contract payments shouldn't be allowed as evidence. They are permissible. And say all the other contract payments and all the other evidence is permissible, then Count 3 is this Court's basis, if you don't like any other counts, to uphold, affirm the conviction on the record of Count 3. But the government also ---- Let me just ask if you were to hypothetically kick out 1, 2, and 6, which were the ones challenged, would that change the sentence? No, because everything was already appropriately brought in as relevant conduct for sentencing purposes. And the restitution was properly calculated just on the unauthorized payments under the contract. And then there were a couple of adjustments made. And these other things for Casitas and Copper Hills were not under the contracts. Those were separate. And so ---- We have your point in mind. Okay. Thank you so much. We've exceeded your time and hers, but why don't I give you another minute? I wanted to quickly address the issue about the payments under these contracts. There was testimony from Mel Cohen, who is an attorney, who talked about what the meaning of the contracts were. And the contracts were there was a written contract initially that said he would be paid $6,000 per month. Now, what Attorney Cohen testified to was that that was a minimum fee contract and that he could not be paid less than that, but he could be paid more. And, in fact, where the minimum would have been $72,000, he was paid $129,000, which Bryant Young signed all the checks or his brother or his bookkeeper. Well, let me ask you about there. Looking at the evidence, what evidence unequivocally shows that anyone from Young and Sons approved paying more than $100,000 a year? Is there a supplemental agreement raising his salary? The agreement itself only established a floor, not a maximum. What is what evidence supports that argument? Well, one, the testimony of Mel Cohen, but also Bryant Young's contemporaneous actions, which is Mr. Narm goes to him and says, I need more money, boss, and he writes him a check. An employer can pay a person anything they want, and when Mr. Young was cross-examined And so did he say, I'm going to pay you more than $100,000 henceforth? What is the evidence that that was just the base salary? Testimony from Mr. Cohen, but also Bryant Young's testimony about his understandings of these contracts and his actions contemporaneously in terms of paying all those. And the reason I included in my additional excerpts of record with my reply all of the checks is if you just look at that series of checks that were signed by Bryant Young, he's showing in practice that he knew what he was paying and he intended to make all of those payments in excess of what was the contract amount. And he did that for two years. Then the testimony with regard to the $500,000 contract by Mr. Cohen and by Bryant Young is it was a flat fee contract that was like earned on receipt. The day after the contract was signed, Mr. Narm was owed $500,000 and he was only paid $495,000. So those compensation payments were the $735,000. $240,000 before October 1st, $495,000 after October 1st of 2006. Thank you. Thank you. I thank both counsel. The case of United States v. Narm is submitted.
judges: Nelson, McKeown, Smith